SHEPARD, Chief Justice,
dissenting.
Gregory Galloway is someone who went shopping at a going-out-of-business sale in the morning, had some lunch at a local restaurant with his aunt and grandmother, and stopped off at a gas station to buy fuel and cigarettes. Calloway appeared normal all day; "everybody was happy," one of his companions said.
When Galloway arrived home, he stabbed his grandmother to death, and then immediately announced that he regretted what he had done. The finder of fact in this case, Judge Mary Willis, concluded on the basis of the admitted evidence that Galloway was not insane at the time of the crime, that is to say, that he knew killing his grandmother was wrong.
Of course, all of the testimony by psychiatrists and psychologists necessarily came from witnesses who were not present at the scene of the crime. They offered their observations based on records of Galloway's medical history from moments other than the hour of the killing and on direct observations of Galloway that occurred months or even years after the crime. One of these experts, Dr. Glenn Davidson, appointed by the court, concluded that Galloway was not insane at the time of the crime. Eyewitness evidence about how Galloway acted before and after the crime also supported the trial court's decision.
This was one of those cases where the defense argued that the perpetrator was sane right before the crime and sane right after the crime, but insane for the sixty seconds or so it took to commit it. Dr. Davidson's basic view was that it was unlikely that Galloway qualified as insane on the basis of a "very thin slice of disorganized thinking." (Tr. at 228.)
Defense counsel's vigorous cross-examination confronted Dr. Davidson with a host of hypotheticals ("now what if I told you") and asked as to each new proposed fact whether it would affect his diagnosis. It was twenty to thirty pages of the sort of energetic cross-examination tactics to which we lawyers are inured but which often befuddle the uninitiated. It finally left the witness saying, in the face of this onslaught, that he was unsure.
As the majority points out, juries and judicial factfinders are not required to take as completely true all or none of what witnesses say. They are entitled to believe and disbelieve some, all, or none of the testimony of experts and non-experts alike. Indeed, their assignment is to sort out truth from cacophony. It was altogether plausible that Judge Willis could credit Dr. Davidson's opinion that Galloway was sane and treat the doctor's answers under cross as less compelling. She could also, of course, give weight to Galloway's own contemporaneous declaration of regret right after he killed his grandmother.
To be sure, if the right of appeal is to be meaningful, both trial and appellate judges must be open to the possibility of mistake. We set a pretty tough standard for trial judges as to casting aside jury verdicts, for example, saying that they may do only when the jury's verdict is "against the weight of the evidence" or "clearly errone *719 ous." Ind. Trial Rule 59(J). Our rules require that the judge who sets aside a jury verdict explain in detail, if you will, why the judge is better at weighing the evidence than the members of the jury. The appellate standard is roughly the same, and appellate judges regularly declare that we who have not even seen the witnesses or the defendant should be extremely restrained when we contemplate announcing that our assessment of the weight of the evidence is superior to that of juries or judges who have seen both.
It seems straightforward enough that Dr. Davidson's testimony and the defendant's own demeanor at the time of the offense support Judge Willis's judgment. Thus, the appellate standard for reversal has not been met. Thompson v. State, 804 N.E.2d 1146, 1149 (Ind.2004) ("evidence is without conflict and leads only to the conclusion the defendant was insane.")
The majority declares that it is not relevant what may happen as a result of this reversal by appellate judges. Not many of our fellow citizens would not recognize this disclaimer of responsibility as legitimate.
As the majority does acknowledge, there is risk involved when appellate judges see-ond-guess a jury or trial judge and acquit a criminal offender. If Galloway is declared not guilty by this Court, the prosecutor will initiate a civil commitment process to determine whether Galloway should be confined because his mental illness makes him a danger to himself or to others.
The one thing we know for sure about Mr. Galloway is that he is in actual fact a danger to others.
We also know what is likely to occur as a result of this Court setting aside Judge Willis's judgment: sooner or later, probably sooner rather than later, Galloway will be determined safe and turned back into society.
The reason we know that is that the civil commitment process has produced such an outcome over and over again with Mr. Galloway. The majority has recited the long trail of medical treatments and mental commitments. It has not focused much in that recitation on how the exercise of expert medical judgments and the civil commitment processes have combined to turn him back out on the street over and over again.
I count perhaps seventeen identifiable encounters by Galloway. But just to name a few, call it number 5, there was a May 1999 event in which Galloway's wife brought him in because he had been carrying around a gun and threatening to use it on his supervisor at work. This trip produced a prescription for medication and a period of outpatient treatment, then a failure to take his medications and a medical trail gone cold.
During encounter number 7, in April 2001, Galloway was admitted to the hospital because of aggressive and frightening behavior at home. He said he had been receiving messages from the television. This interaction with the system produced several months of monitoring during which Galloway took some of his medicines and not others. And then he was out.
During encounter number 8, Galloway was involuntarily committed because he had threatened to kill his neighbor and his grandmother. He was released from commitment and then admitted again just a month later, in March 2002. He stayed a few months at Richmond State Hospital before being declared safe for release.
In encounter number 13, not long before Galloway killed his grandmother, Galloway came under care after he stopped taking his medicines and began reporting halluci *720 nations and recurring thoughts of suicide. After being stabilized, he was discharged to live with his grandmother, with a result plain and painful for all to see.
I mention this litany-just salient elements in an even longer story-to suggest that some innocent future victim is placed at risk by this Court's decision to second-guess Judge Willis A society that responds to such violence with tolerance should well expect that it will experience more violence than it would if it finally said, "This is unacceptable." Not knowing what I would say to the next victim, I choose to stand with Judge Willis and affirm the judgment of guilty but mentally ill.
DICKSON, J., joins.